[Cite as *State v. Phillips*, 2016-Ohio-3105.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                   CASE NO.  1-15-43

      v.

JAQUONE L. PHILLIPS,                   O P I N I O N

      DEFENDANT-APPELLANT.


Appeal from Allen County Common Pleas Court
Trial Court No. CR20140180

Judgment Affirmed

Date of Decision:   May 23, 2016


APPEARANCES:

    *Kenneth J. Rexford* for Appellant

    *Jana E. Emerick* for Appellee

**SHAW, P.J.**

{¶1} Defendant-appellant, Jaquone L. Phillips, appeals the June 17, 2015 judgment of the Allen County Court of Common Pleas journalizing his conviction by a jury for one count of murder with a firearm specification and one count of having weapons while under disability. The trial court sentenced Phillips to an indefinite prison term of fifteen years to life for the murder conviction, a mandatory three-year prison term for the firearm specification, and a thirty-month prison term for having weapons while under disability. The trial court ordered the sentences to run consecutive for a total prison term of twenty and a half years to life.

{¶2} On April 22, 2014, the Allen County Grand Jury returned a three-count indictment against Phillips for one count of murder with a firearm specification, one count of felonious assault with a deadly weapon, also with a firearm specification, and one count of having weapons while under disability. The charges stemmed from an incident occurring on April 12, 2014, at approximately 3:55 a.m., at H&R's Lounge in Allen County, Ohio, where then eighteen-year-old Phillips was alleged to have shot and killed eighteen-year-old Marcus D. Simpson, Jr. during a physical altercation. The felonious assault charge arose from the allegation that Phillips also shot Devontae K. Williams, who suffered a non-lethal gunshot wound as a result of the same incident. Phillips had

been previously adjudicated a delinquent child due to his commission of an aggravated robbery as a juvenile and was prohibited from lawfully carrying a firearm.

{¶3} Phillips appeared for arraignment, was appointed counsel, and entered pleas of not guilty. The trial court subsequently granted counsel's motion to withdraw from Phillip's representation based upon a breakdown of trust and appointed Phillips new counsel.

{¶4} On March 9, 10, and 11, 2015, the trial court conducted a three-day jury trial. Prior to empaneling the jury, the prosecution dismissed Count Two, the felonious assault charge with respect to Devontae Williams.[1] The prosecution proceeded with its case as to Count One, the murder of Marcus Simpson, Jr., with a firearm specification, and as to Count Three, having weapons while under disability. Several witnesses testified for the prosecution to establish that Mr. Simpson died from a single gunshot wound to the chest and that Phillips was the shooter. As for proving the identity of the shooter, the prosecution presented the testimony of Emily W., a witness to the events at H&R's lounge, and Detective Mark Baker, the lead investigator in the case. On the stand, these witnesses reviewed and discussed surveillance video footage from the parking lot at H&R's lounge depicting the shooting and identified Phillips in the videos. Detective

---

[1] The record indicates that Mr. Williams refused to speak to law enforcement during the investigation of the incident and that he died in a car accident prior to trial.

Baker's testimony also included a discussion of a video recording of Phillips' Mirandized statements to law enforcement after the incident. In his defense, Phillips presented the testimony of his sister and two friends, who were also at H&R's lounge on the night of Simpson's death and who all claimed that Phillips was not the person who shot Simpson.

{¶5} The jury heard evidence from both sides on the first two days of trial. Closing arguments were set to begin the next day. Prior to the jury convening for the third day, it was brought to the trial court's attention that a juror had been contacted by an individual inquiring about her status as a member of the jury. Outside of the jury, the trial court conducted an inquiry regarding the circumstances of the phone call with the juror and with counsel present. Defense counsel moved for the juror to be excused. The trial court overruled the request, being satisfied by the juror's representations that the brief phone call did not impede her ability to be fair and impartial in rendering a verdict in the case. The case continued to closing arguments and the reading of the court's jury instructions.

{¶6} On March 11, 2015, the jury returned a verdict of guilty on both Counts One and Three and the firearm specification. The trial court continued sentencing pending the completion of a pre-sentence investigation report. On March 13, 2015, the Journal Entry of Conviction was filed.

{¶7} On April 29, 2015, Phillips sought leave to file a delayed motion for a new trial based upon two allegations of juror misconduct and/or bias. In support, defense counsel asserted that he was not notified of the juror misconduct or bias claims by Phillips' family members until after the fourteen-day time limit for filing a motion for a new trial had expired. Accordingly, defense counsel asserted that he was unavoidably prevented from discovering these alleged facts which formed the basis for a new trial request. *See* Crim.R. 33(B).

{¶8} On May 19, 2015, the trial court overruled Phillips' motion for leave finding he failed to prove by clear and convincing evidence that he was unavoidably prevented from filing his motion for a new trial within fourteen days of the jury rendering its verdict as required by the criminal rules and that Phillips failed to provide any evidentiary support for his claims that juror misconduct or bias occurred.

{¶9} On June 17, 2015, the trial court sentenced Phillips to an aggregate prison term of twenty and a half years to life.

{¶10} Phillips filed this appeal, asserting the following assignments of error.

## ASSIGNMENT OF ERROR NO. I

**MR. PHILLIPS WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND HIS CONFRONTATION CLAUSE RIGHTS, AS GUARANTEED BY BOTH THE UNITED STATES CONSTITUTION AND THE OHIO**

**CONSTITUTION, WHEN THE TRIAL COURT ALLOWED DET. BAKER TO TESTIFY ABOUT A VIDEO TAPE WITH HIS KNOWLEDGE PURPORTEDLY BASED ON THE STATEMENTS OF OTHERS NOT PRESENTED AS WITNESSES BY THE STATE WITH NO OBJECTION FROM DEFENSE COUNSEL.**

<u>**ASSIGNMENT OF ERROR NO. II**</u>

**MR. PHILLIPS WAS DENIED HIS RIGHT TO EFFECTIVE COUNSEL AND HIS JURY TRIAL RIGHTS, AS GUARANTEED BY BOTH THE UNITED STATES AND THE OHIO CONSTITUTION, WHEN THE DEFENSE COUNSEL FAILED TO PROPERLY AND TIMELY INVESTIGATE MULTIPLE INSTANCES OF JUROR BIAS AND IMPROPRIETY AND WHEN WEAK OBJECTIONS WERE OVERRULED.**

*Standard of Review*

**{¶11}** The issues raised by Phillips on appeal both involve allegations that he received ineffective assistance of counsel during the trial court proceedings. To establish his claims, Phillips must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him. *State v. Jackson*, 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 133, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both

-6-

components of the inquiry if the defendant makes an insufficient showing on one.").

{¶12} In order to show counsel's performance was deficient, appellant must prove that counsel's performance fell below an objective standard of reasonable representation. *Jackson* at ¶ 133. The appellant must overcome the strong presumption that defense counsel's conduct falls within a wide range of reasonable professional assistance. *Strickland* at 689. With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

### *First Assignment of Error*

{¶13} The first instance of ineffective assistance of counsel alleged by Phillips involves his claim that counsel failed to object to certain statements made at trial by Detective Mark Baker identifying Phillips as the person who shot and killed Marcus Simpson, Jr. in the parking lot surveillance footage. Specifically, Phillips argues that Detective Baker's statements identifying Phillips in the video

were inadmissible because they were based upon hearsay due to the fact that Detective Baker only learned of Phillips' identity through his investigation by speaking with others who were able to identify Phillips on the surveillance video. Phillips also contends that his confrontation rights were impinged upon when these individuals were not called to testify and therefore should have prompted an objection from defense counsel. In order to properly address Phillips' claim, it is necessary to examine all the evidence at trial establishing Phillips' identity as the individual who shot and killed Simpson at H&R's lounge on April 12, 2014.

*1. Emily's W. Testimony*

{¶14} Emily W. was called as a witness for the prosecution and was the first witness to provide testimony before the jury regarding Phillips' identity on the video surveillance footage. Emily stated that at the time of the shooting in April 2014 she was best friends with Phillips' younger sister, Latavia ("Tavi"), and as a result saw Phillips on a regular basis. She explained that Phillips was the leader of a "gang" called the "Cash Crew" or "CCE," which had a well-known rivalry with another group called the "Eastside" or "Eastsiders." (Tr. at 286-87). According to Emily, both Simpson and Williams were affiliated with the Eastside group.[2]

---

[2] At trial, the prosecution introduced a video posted on social media a few weeks prior to the April 12, 2014 incident at H&R's lounge which depicted several members of the Eastside. One member identified by Emily as Carrington L. is heard threatening Phillips and other CCE members. Specifically, Carrington states that Phillips is "going to die this summer" and that the next time he shoots he intends to kill one of

{¶15} Emily recalled meeting Tavi at Phillips' family home on Madison Avenue on April 11, 2014, at around 10:30 p.m., when she finished her shift at work. She observed Phillips dancing outside the home with friends and waving a gun in the air. That night, Emily drove a rental car and volunteered to drive a group of individuals, which included Phillips and Tavi, and two others, Jariay T. and Drake J., to AJ's, a local bar. After the bar closed, Emily drove the group to H&R's Lounge, an afterhours club. The prosecution introduced surveillance video taken from inside the entrance to the club. (State's Ex 15). Emily identified Phillips on the interior surveillance footage at 3:05 a.m. attempting to gain entry into the club, being denied access, and exiting through the front door. She identified Phillips wearing a dark grey sweatshirt with a white Nike "swoosh" symbol and a black hat.

{¶16} Emily explained that after she dropped off Phillips and Drake at the club, she, Tavi, and Jariay remained in the vehicle because they were underage and knew they could not get in. They were also waiting to see if Phillips and Drake could get into the club. Emily recalled Tavi receiving a text from Phillips and remembered seeing Phillips' name appear on the phone. Tavi then read the text out loud to Emily, which asked Tavi to retrieve Phillips' gun from their home on Madison Avenue, less than a ten minute drive from the club.

the CCE members. (State's Ex. 16). Notably, Carrington was not involved in the April 12, 2014 incident—the record suggests he was in jail at the time—and neither Simpson nor Williams appeared in this video.

{¶17} Emily drove Tavi and Jariay to the Madison Avenue house. Emily observed Tavi get out of the car and go to the side of the house where some vehicles were parked. She recalled Tavi's hands being empty when she exited the vehicle. In the meantime, Emily went into the house to use the bathroom, when she returned to her vehicle Tavi was still outside the home searching for something. Tavi eventually came back to the vehicle holding a maroon case with a zipper in her hands. Upon sitting in the vehicle, Tavi placed the case in her lap. Emily asked Tavi to hide the case somewhere because she did not want the case in plain view in the event that they were stopped by law enforcement. Emily observed Tavi place the case in the side compartment of the passenger door.

{¶18} Emily, Tavi, and Jariay returned to H&R's after stopping at the Madison Avenue home. Phillips and Drake were standing outside of the club and climbed into the vehicle. According to Emily, Drake sat in the middle back seat and Phillips sat in the passenger back seat, behind Tavi. Emily recalled that Phillips was not in the car very long before Tim W., a fellow CCE member and Jariay's boyfriend, informed Phillips through the car window that Aaron J. or "Red," a member of Eastside, was also in the parking lot of the club.[3] Shortly thereafter, Emily observed Phillips exit the car and remembered seeing him talking with some friends in the parking lot.

---

[3] The record indicates that Red is also Carrington L.'s brother.

{¶19} Emily moved the vehicle and parked it to the side of the club's entrance. The prosecution played surveillance video footage of the parking lot and asked Emily to identify her vehicle. (State's Ex. 14). At the time, Tavi, Jariay, and Drake were still in the vehicle. Emily narrated what occurred on the video as she remembered it from that night. Emily reversed the vehicle from the parking space on the side of the club and turned it to face a different direction. She explained that she did this at Tavi's request so that Tavi could get a better look at an impending physical altercation brewing in the parking lot between Tim W. and Red. Emily then witnessed Tim W. hit Red through the window of a white vehicle Red was sitting in. Emily recalled that Tavi and Jariay exited the vehicle as a fight broke out in the crowd that had amassed around the vehicle where Red was seated. She identified the location on the video where Tavi and Jariay were standing in the parking lot.

{¶20} Emily backed her vehicle into where she was previously parked and faced the parking lot as the fight escalated to involve several more individuals. Emily recalled hearing three gunshots, watching people scatter, and observing Phillips run towards her vehicle shortly thereafter. She identified Phillips on the surveillance footage as the individual running toward her vehicle. (Tr. at 318). At this point only Emily and Drake were in the car when Phillips jumped into the front passenger seat of the vehicle. She testified that Phillips immediately

instructed her to "Go, Go, Go." (Tr. at 319). Emily asked about Tavi, whose cell phone and other personal effects were still in the vehicle. Phillips told her "It's okay. She'll find a ride. Just keep going." (Id.).

{¶21} Emily drove the vehicle out of H&R's parking lot and began driving toward Drake's house at Phillips' direction. Phillips changed his mind and told her to drop them off at a park near Drake's house. Emily, now alone in the vehicle, drove back to H&R's to look for Tavi, but at that point law enforcement had arrived to secure the scene. Phillips contacted Emily and she picked Phillips and Drake up from Drake's home. While in the vehicle, Emily answered a call from Divante H. on Tavi's phone, who directed Emily to drive Phillips and Drake to his house. There, various individuals who had been at H&R's gathered and discussed what had transpired. Emily recalled several people bragging about who they were fighting with in H&R's parking lot. She remembered Phillips talking about fighting with Simpson. While at Divante's home, the group learned through social media of Simpson's death. Emily identified Simpson from a photograph taken at the scene, which depicts him lying in the doorjamb of the driver side door of his vehicle shortly before his death.

{¶22} Emily recalled seeing the maroon zippered case again when she dropped off Marquise G. at his home. This was the first time Marquise was in her vehicle. As Marquise walked onto the porch, Drake, who was seated in the back

seat of the car, noticed the maroon case on the floor in the back seat on the passenger side. Emily observed Drake lobbing the case out of the car to Marquise, stating "Hey, he left this in the car." (Tr. at 380). She noticed that the case appeared empty because of the way Drake tossed it to Marquise. Phillips was not in the vehicle at the time.

{¶23} A few days after the incident, Emily called Phillips to inform him that she was going to see a lawyer because a detective wanted to speak to her about the incident at H&R's lounge. She warned Phillips that law enforcement may also be looking for him. Phillips instructed Emily to tell her attorney that none of the individuals in her car that night were involved in the fight in the parking lot. Later that day, after speaking to her attorney and law enforcement, she drove to her parents' house. As she exited her car, she noticed Phillips sitting in a nearby parked car, smiling at her. Phillips asked her how the meeting with her attorney went and if she repeated the story he told her to tell. Emily responded "Yeah" and then her father came outside. (Tr. at 327). Phillips asked her if the man was her father to which she responded "Yeah" and then Phillips left. (Id). Emily went inside the house and looked out the window. She observed Phillips drive past her house again.

2. *Phillips' Statements to Law Enforcement*

{¶24} On April 15, 2014, Detective Baker conducted an interview with Phillips regarding the shooting at H&R's Lounge. At trial, a video recording of this interview was introduced by the prosecution during Detective Baker's testimony. (State's Ex. 20). In the interview, Phillips recalled driving from AJ's to H&R's on April 12, 2014. On that night, he said he wore a grey hooded sweatshirt with a Nike "swoosh," camo pants or "black Levi's." He recounted his attempts to get into the club which were eventually rejected. Phillips remembered he and Drake returned to Emily's vehicle which was parked in the club's parking lot. Phillips acknowledged that he exited Emily's car before she moved to park near the club as seen on the parking lot surveillance footage.

{¶25} Phillips described the fight breaking out involving Tim W. and Red, which escalated to involve several other individuals including Simpson and Williams. He admitted to being part of the group fighting, however, he denied having a gun that night and he denied shooting Simpson. Instead, Phillips claimed he was engaged in the brawl hitting Williams when he heard two gun shots. Phillips recalled seeing Simpson fall to the ground after he heard the shots. (State's Ex. 20 at 59:20). He stated that he started to run and noticed his phone falling out of his hooded sweatshirt. (Id. at 59:29). Phillips admitted to bending down by a car to pick up his phone. (Id. at 59:35). He then ran to where he

thought Emily's car was parked in the parking lot, but found it was no longer there. That is when he ran over to Tavi and asked, "Where's the car at. Come on!" and Tavi showed him where Emily's vehicle was now parked, however, Tavi remained in the parking lot engaged in the fight. (Id. at 59:45; 1:07:42). Phillips admitted that he then ran to Emily's car, got in, and left H&R's. (Id. at 59:50).

*3. Video Surveillance Footage of H&R's Parking Lot*

{¶26} The video surveillance footage of H&R's parking lot was played during the testimony of Emily and Detective Baker. The video is approximately five minutes long and depicts the events immediately before, during, and after the shooting of Simpson. At the beginning of the video, an individual wearing a dark grey hooded sweatshirt, camo pants, and dark shoes can be seen congregating with two other individuals near Simpson and Williams at the entrance of the club. The three individuals begin to follow Simpson and Williams as they walk away and appear to engage in a dialogue with them as they all continue to walk toward the parking lot. During this time more individuals approach to form a group around a white car attempting to leave a parking space next to Simpson's gold Tahoe in the parking lot.

{¶27} At this time, Emily's car, which is parked near the club's entrance, can be seen reversing out of the parking space and changing direction to face toward the now amassed group of people surrounding the white vehicle. As the

activity of the group begins to escalate, two females exit Emily's vehicle—one from the front passenger door and one from the rear driver side door. The two females join the group surrounding the white car, which is now in the driveway blocking the flow of traffic. Emily reverses her vehicle into the same parking space where she was previously parked. The group of individuals begins to push and shove one another and move as a group behind Simpson's parked vehicle. As they round the front of the vehicle, the flurry of activity intensifies into punches being thrown between Simpson, Williams, and several other individuals.

{¶28} The melee continues around to the driver side of Simpson's vehicle where Simpson is now located near the driver side door. The individuals engaged in the skirmish with Williams break away from Simpson, continue past Simpson's vehicle and proceed into the gravel driveway. As the group involving Williams passes the back end of Simpson's vehicle, a person in a dark grey hooded sweatshirt, dark pants, and dark shoes rises up from the ground, near a parked white car, in a shooting stance with a gun pointed at Simpson, who is still located by the driver side door of his vehicle. People scatter as the gun appears to be fired. The individual seen in the shooting stance runs toward some parked cars and then returns to where the gun was fired to pick something up from the ground. The individual runs toward one of the females who earlier exited Emily's vehicle.

The female points to where Emily's vehicle is parked and the individual runs to Emily's vehicle, which drives away shortly thereafter.

*4. Detective Baker's Testimony*

**{¶29}** At trial, Detective Baker testified that he was the lead investigator assigned to the case. He explained that he obtained the surveillance video from H&R's lounge at around 8:00 a.m. on the morning of April 12, 2014—a few hours after the shooting. He recalled reviewing the footage of the parking lot depicting the shooting "hundreds" of times. (Tr. 416). He stated that the only people he was able to identify from his initial review of the footage were Simpson and Williams—the two shooting victims—and that the video itself was not enough to reveal the identity of the person seen in the "two-hand high point shooting position" firing at Simpson. (Tr. at 420). He explained that he interviewed "numerous" individuals to assist him with identifying the shooter and the many other individuals seen participating in the events surrounding the shooting. (Id. at 423).

**{¶30}** After learning the identity of the key participants, Detective Baker described the distinct clothing that many of these individuals wore that night which assisted him in distinguishing the different figures in the footage. The parking lot video was recorded on a camera located at some distance from where the shooting occurred and did not provide a clear picture of these individuals'

faces. Detective Baker used the distinctive clothing of each individual to follow them through the video footage and observe their conduct. He was also able to match some of these individuals to footage from inside the club's entrance which provided clearer picture of the individuals' faces and was recorded from a much closer distance. Phillips was one such individual.

{¶31} Detective Baker observed Phillips from the interior surveillance footage wearing a grey hooded sweatshirt with a Nike white "swoosh" and camo pants. (Tr. 431). He explained that the same individual identified as Phillips is also seen on the parking lot video footage standing near the club's entrance wearing the same clothes and dark shoes. Detective Baker explained the dark shoes were significant in reviewing the parking lot video because the other individuals seen near Phillips are wearing dark clothes and white shoes. On the stand, Detective Baker narrated the actions taking place on the video and identified the key participants for the jury. In particular, he tracked Phillips' movements throughout the video and identified Phillips as the individual in the shooting stance firing a gun at Simpson and eventually running to Emily's vehicle.

{¶32} Detective Baker explained how Phillips' statements during the interview with him corroborated his identification of Phillips as the shooter on the video. He described "back tracking" the video from where the shooter ran to Emily's rental car to where the shooting took place which establishes that the

same person running to that vehicle was the same person seen in the shooting stance. Detective Baker further noted that Phillips' own recollection and statement of his actions after the shooting during the interview mirrored those taken by the shooter on the video. Specifically, that after the shooting, Phillips said he picked up his phone which he dropped near a parked car, ran to where he thought Emily's car was parked, ran to his sister to find out where the car had been moved, and then jumped into Emily's vehicle. In his testimony, Detective Baker thus demonstrated that these were the same actions taken by the individual in the two-hand high point shooting position on the video.

*Discussion*

{¶33} On appeal, Phillips claims that his trial counsel should have objected to Detective Baker's testimony identifying Phillips on the video because Detective Baker was only able to identify Phillips through the statements of others who did not testify at trial. Thus, Phillips maintains that his trial counsel was ineffective for failing to object on the basis of impermissible hearsay and a violation of his rights protected by the Confrontation Clause. The prosecution argues, *inter alia*, that Detective Baker's testimony regarding the identification of Phillips as the shooter on the parking lot video was not objectionable hearsay because his testimony was not being offered for the truth of the matter asserted but to explain the progress of the investigation.

{¶34} Hearsay is "a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). An out-of-court statement offered for reasons other than the truth are not hearsay. *State v. Lewis*, 22 Ohio St.2d 125, 132-33, (1970). As a general rule, a statement offered to explain a police officer's reasons for conduct while investigating a crime does not constitute hearsay. *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, ¶ 24, citing *State v. Thomas*, 61 Ohio St.2d 223, 232 (1980). However, "[t]he conduct to be explained should be relevant, equivocal and contemporaneous with the statements[, and] such statements must meet the standard of Evid.R. 403(A)." *State v. Blevins*, 36 Ohio App .3d 147, 149 (10th Dist.1987).

{¶35} It is apparent from the record that Detective Baker was able to identify Phillips on the video from multiple sources, including the statements of Phillips and Emily, together with other law enforcement and unspecified witnesses during his investigative interviews. As a result, the record demonstrates that Detective Baker's testimony was not the only evidence establishing Phillips' identity as the individual who shot Simpson.

{¶36} Emily testified that Tavi received a text from Phillips asking her to retrieve his gun from the family home—where Emily saw Phillips with a gun hours earlier. She saw Tavi bring a maroon zippered case from the side of the

home into the car. Emily observed Tavi hide the case in the passenger side door compartment after she asked Tavi to conceal it from plain view. She recalled the same maroon zippered case being found after the shooting where Phillips had been sitting in the vehicle immediately after she and Tavi returned from Phillips' home.

{¶37} At trial, Emily identified Phillips on the interior surveillance video wearing a dark grey sweatshirt with a white Nike "swoosh" symbol. Emily also identified on the parking lot video where her car was parked at the time of the shooting. She testified that Phillips ran to her car immediately after she heard gun shots and told her to "Go, Go, Go." She also specifically identified Phillips on the video at trial as the individual seen running to her car following the shooting.

{¶38} Phillips further developed the evidence establishing his identity as the individual in the two-hand high point shooting position in the parking lot surveillance footage by recounting the steps he took after the shots were fired. The movements he described and the location in the parking lot where they occurred were identical to the individual seen fleeing from the scene after firing the shot that killed Simpson.

{¶39} Specifically, Phillips stated (1) that he ran away from where the shots were fired but realized he dropped his phone and ran back toward that direction to retrieve it—the video depicts the shooter running away and then returning to the place where the gun was fired to pick something off the ground; (2) that he ran to

where Emily had previously been parked in the parking lot but not seeing her car found Tavi and stopped to ask her where Emily was now parked—on the video the shooter can be seen zig zagging between locations and then approaching a female who earlier exited Emily's car. The female points to where Emily's car is parked; and (3) that upon locating Emily's vehicle, he ran to the car, jumped in the car and left the scene—the video shows the shooter leave the female and run straight to Emily's vehicle and the vehicle drives away.

{¶40} Phillips also admitted to wearing a dark grey sweatshirt with a white Nike "swoosh" symbol and camo pants. This attire matched the one worn by the shooter on the video and was the distinctive clothing described by Detective Baker to initially identify Phillips on the video and to track his movements throughout the recorded events.

{¶41} Finally, the video itself clearly depicts the individual in the shooting stance aiming at Simpson as the same individual who engages in conduct identical to the conduct narrated by Phillips in his interview to law enforcement from the moment of the shooting continuously to the point of entering Emily's car.

{¶42} In sum, Emily's testimony, Phillips statements during his interview, and the video each provided an independent basis, entirely apart from the testimony of Detective Baker, for establishing Phillips' identity as the person who shot Simpson on the parking lot surveillance video. Thus, even if we were to find

some of Detective Baker's testimony to be impermissible hearsay, it was merely cumulative to other direct non-hearsay evidence. Hearsay statements admitted that are repetitious of admissible statements and are supported by overwhelming evidence are not prejudicial. *State v. Self*, 56 Ohio St.3d 73, 82, (1990); *see also State v. Bump*, 3d Dist. Logan No. 8-12-14, 2013-Ohio-1006, ¶ 98 (recognizing that "[a]ny error in the admission of hearsay is generally harmless when the declarant is cross-examined on the same matters and the seemingly erroneous evidence is cumulative in nature"). Accordingly, we cannot find that the testimony was prejudicial, or that Phillips' counsel was ineffective for failing to object to it. Phillips first assignment of error is overruled.

### *Second Assignment of Error*

**{¶43}** The second instance of ineffective assistance of counsel asserted by Phillips involves his claim that trial counsel mishandled alleged incidents of juror misconduct or bias. Specifically, Phillips claims that trial counsel was ineffective for failing to question potential jurors during voir dire as to whether they knew any of the witnesses or other individuals involved in the case. Phillips identified three instances of alleged jury misconduct or bias to support his claim that he received ineffective assistance from his trial counsel.

*1. Juror Hughes*

{¶44} During the first two days of trial, the jury heard the evidence presented by both sides. Closing arguments were anticipated to begin on the third day of trial. Before the jury was brought into the courtroom, the Bailiff informed the trial court that Juror Hughes had received a phone call the night before from a person not involved the case inquiring about her status as a member of the jury. The trial court discussed the issue with counsel. Defense counsel requested that certain information regarding Juror Hughes be placed on the record. Specifically, defense counsel relayed concerns from Phillips' family regarding Juror Hughes' purported connection to relatives of Devontae Williams, the non-fatal shooting victim in the case. In particular, that Juror Hughes' sister was rumored to be dating one of Williams' uncles.

{¶45} The trial court called Juror Hughes into the courtroom, with the remaining members of the jury still waiting in the jury room and with counsel present. The following discussion was had on the record:

> **Trial Court: * * * The Bailiff has brought to my attention the fact that you had reported to her what you believe to be a call related to this case or conceivably perhaps related to this case.**
>
> **Juror Hughes: Yes.**
>
> **Trial Court: Is that correct?**
>
> **Juror Hughes: Yes.**

**Trial Court: Would you specifically tell us the nature of the call?**

**Juror Hughes: I had received a text and it said, "Can you call me, please?" And it is one of my niece's friends. So I called him and he said, "I heard that you was [sic] one of the jurors." And I said, "I'm not allowed to talk about it," and I hung up.**

**Trial Court: Okay. How did that make you feel as it relates to an ability to continue to involve yourself in this case? Did that— did you cause that to be an attempt to sway you or an attempt to intimidate you?**

**Juror Hughes: I don't think—**

**Trial Court:—Or in any way make you uncomfortable?**

**Juror Hughes: I wasn't uncomfortable. I don't know if he was just trying to get information out of me, but, I mean, I'm fine. I don't feel persuaded, or—**

**Trial Court: You don't feel intimidated?**

**Juror Hughes: No.**

**Trial Court: You're still capable, you believe, despite the phone call, to continue to hear what transpires or goes on in the courtroom?**

**Juror Hughes: Yes.**

**Trial Court: And you can make a decision following the law that I'm going to give, is that correct?**

**Juror Hughes: Yes.**

**Trial Court: Consistent with your oath, of course?**

**Juror Hughes: Yes.**

**Trial Court: Now, [Defense Counsel] indicates that members of the other side of this case, Mr. Phillips' family, indicates that you may have relatives that are friends of the Devontae William—of the Devontae Williams' family whose name you've heard in this case. Do you know anything about that?**

**Juror Hughes: No. I know the guy that called me yesterday is actually friends with two girls that was sitting on Mr. Phillips' side—**

**Trial Court:—the left side—on the right side of the courtroom?**

**Juror Hughes: Yes.**

**Trial Court: Okay. Does that make you feel any—in any way, shape, form, uncomfortable about continuing to be involved in the case?**

**Juror Hughes: No. Not at all.**

**Trial Court: Do you—do you feel you wish to continue to be involved in the case, recognizing it's obviously some interest here over what you've heard over the last two days?**

**Juror Hughes: Yeah, I don't mind continuing.**

**Trial Court: Okay. And, again, you feel you can be fair and impartial?**

**Juror Hughes: Yes.**

(Tr. at 586-89).

**Trial Court: Okay. Do you know anyone that's related to Devontae Williams in any way, shape, or form?**

**Juror Hughes: I think it might be his cousin.**

**Trial Court: So, you might know of a cousin?**

**Juror Hughes: Yes.**

**Trial Court: Do you actually know that—**

**Juror Hughes: I'm not—**

**Trial Court:—person's name?**

**Juror Hughes: Marcus. He hangs out with my nieces.**

**Trial Court: Okay. Do you know who called you or texted you and asked you to call?**

**Juror Hughes: Yes.**

**Trial Court: What was that individual's name?**

**Juror Hughes: His name's Jaden. I think his last name is Goodin or Goodwin, or—**

**Trial Court: Has that individual been in the courtroom?**

**Juror Hughes: I don't think so.**

**\* \* \***

**Trial Court: Do you know about his age?**

**Juror Hughes: Nineteen or twenty.**

**Trial Court: Okay. Roughly the same age of the folks that have been largely involved in this case.**

**Juror Hughes: Yes. And that's the same ages as my nieces are.**

**Trial Court: Did you sense in any way that he was intimidating of you?**

**Juror Hughes: No, not at all.**

> **Trial Court: Did it seem to you he was more curious than anything?**
>
> **Juror Hughes: Yes.**

(Tr. at 590-93).

{¶46} The trial court permitted Juror Hughes to return to the jury room and instructed her not to discuss the matter with the other members of the jury. The trial court then addressed the matter with counsel. Defense counsel requested that Juror Hughes be excused "in an abundance of caution." (Tr. 598). The trial court brought Juror Hughes back into the courtroom for further inquiry. She reiterated her ability to be fair and impartial consistent with her oath.

2. *Motion for Leave to File a Delayed Motion for a New Trial: Juror Thompson and an Unspecified Member of the Jury.*

{¶47} The record reflects that defense counsel filed a Motion for Leave to file a delayed motion for a new trial based upon two further allegations of juror bias. The first claim of juror bias or misconduct stemmed from Phillips' assertion that Juror Thompson failed to disclose her relationship to Carrington L., one of the individuals heard threatening Phillips on a video posted on social media. This video was played for the jury and admitted as an exhibit. Phillips claimed that Juror Thompson was an aunt to Carrington L. The second instance of juror bias alleged in this motion was based upon the claim that an unspecified juror was seen at a lunchtime recess talking to the mother of the victim while leaving a restaurant

across the street from the courthouse. Neither of the alleged instances of juror misconduct or bias was supported by affidavit or by any independent, corroborative evidence, but rather both allegations were entirely based upon the mere assertions of Phillips and his family. Notably, the trial court overruled Phillips' motion on the basis that Phillips failed to establish that he was unavoidably prevented from timely filing a motion for a new trial and that he failed to substantiate his claims of juror misconduct.

{¶48} On appeal, Phillips contends that his counsel was ineffective for failing to timely file a motion for a new trial and for failing to question the jurors about their possible relationships to any of the individuals involved in the case. With respect to his first claim, the record demonstrates that trial counsel stated in the motion for leave that he was not aware of the allegations of juror misconduct until Phillips' family members approached him on April 16, 2015—over a month after the verdict was rendered and well past the expiration of the timeframe to timely file a motion for a new trial. [4] Trial counsel maintained that prior to this time he had no knowledge of these allegations. Nevertheless, upon learning of these claims, trial counsel took the appropriate steps to pursue a delayed motion

---

[4] Criminal Rule 33(B) states in relevant part, "Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein."

for a new trial. Accordingly, we fail to see how trial counsel was ineffective on this basis.

{¶49} Regarding Phillips' second contention, we note that during voir dire the trial court asked the potential jurors if they were related to Phillips, to counsel for either party, or to members of law enforcement. The trial court also specifically asked if the potential jurors harbored any prejudice or bias against Phillips personally. Phillips contends that his trial counsel should have cast a broader net than the trial court and asked potential jurors if they knew any of the numerous people connected to the case—regardless of how tangential or remote their involvement to events surrounding the murder of Simpson. Phillips also maintains that trial counsel should have been more aggressive in handling the situation with Juror Hughes and questioned her for bias.

{¶50} It is an accepted fact that "voir dire is largely a matter of strategy and tactics * * *." *State v. Keith*, 79 Ohio St.3d 514, 521, 1997-Ohio-367. "The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans*, 63 Ohio St.3d 231, 247 (1992). Additionally, we give deference to decisions by trial counsel during voir dire because trial counsel sees and hears jurors and is in the best position to determine whether voir dire questions are needed. *State v. Sanders*, 92 Ohio St.3d 245, 274, 2001-Ohio-189, citing *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989).

Moreover, the *Strickland* test requires a finding of prejudice before this court can find ineffective assistance. *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 213 citing *Strickland* at 693. To maintain a claim that he was prejudiced by counsel's failure to challenge an allegedly biased juror, Phillips " 'must show that the juror was actually biased against him.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 67, quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir.2001).

{¶51} Here, the record establishes that the trial court conducted a thorough inquiry of Juror Hughes regarding the phone call she received from a third person and her possible connection to a family member of Devontae Williams. Juror Hughes said nothing to indicate that she harbored any bias against Phillips or that her ability to be fair or impartial had been compromised. There is also nothing in the record to substantiate Phillips' claims that trial counsel was somehow ineffective for failing to inquire further of Juror Hughes. To the contrary, Phillips' trial counsel requested Juror Hughes be excused despite the lack of evidence of her bias against Phillips. As to the other instances cited by Phillips in support of a new trial, the record demonstrates that Phillips simply failed to provide any evidence demonstrating that either of these jury members was actually biased against him or that his trial counsel's handling of the matter fell below an objective standard of reasonableness.

{¶52} Accordingly, Phillips cannot satisfy either prong of the test for ineffective assistance of trial counsel; i.e., he is unable to show that the performance of his counsel was deficient or that the outcome of his trial was altered as a result of the inclusion of Juror Hughes, Juror Thompson or any other member on the jury. For this reason, Phillips' second assignment is without merit.

{¶53} For all these reasons, the assignments of error are overruled and the judgment and sentence are affirmed.

*Judgment Affirmed*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**