[Cite as *State v. Stewart*, 2018-Ohio-2245.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                CASE NO.  8-17-47

      v.

ALEXIS J. STEWART,                O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Logan County Common Pleas Court
Trial Court No. CR17-05-0145

Judgment Affirmed

Date of Decision:   June 11, 2018

APPEARANCES:

    *Kenneth J. Rexford* for Appellant

    *Eric C. Stewart* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, Alexis Stewart ("Stewart"), brings this appeal from the November 13, 2017, judgment of the Logan County Common Pleas Court sentencing him to an aggregate 17-year prison term after Stewart was convicted in a jury trial of two counts of Corrupting Another with Drugs in violation of R.C. 2925.02(A)(3), both second degree felonies, and one count of Illegal Conveyance of Drugs onto Grounds of a Specified Government Facility in violation of R.C. 2921.36(A)(2), a third degree felony. On appeal, Stewart argues that he received ineffective assistance of counsel, that there was insufficient evidence presented to support his convictions for Corrupting Another with Drugs, that his convictions for Corrupting Another with Drugs were against the manifest weight of the evidence, and that the trial court improperly instructed the jury regarding "controlled substances."

*Relevant Facts and Procedural History*

{¶2} There were essentially three separate incidents giving rise to the charges in this case. The first occurred on July 10, 2016, when Stewart was a rear-seat passenger in a vehicle that was stopped by the Bellefontaine City Police Department. The driver of the vehicle gave officers consent to search the car and officers located a plastic baggy with several white pills in it and a capsule containing a white powdery substance. The white powder was tested and found to contain

cocaine and fentanyl. The plastic baggy was located in the back seat of the vehicle, stuffed between the seat and the wall, approximately where Stewart was sitting.

{¶3} The second incident occurred on January 14, 2017, wherein Martha Baker overdosed on drugs in the parking lot of a gas station in DeGraff. She was revived by Narcan and survived. She indicated to medical personnel that she had received a white powdery substance from Stewart. When responders had initially approached the scene, Stewart was present, performing CPR on Martha. Stewart was questioned and gave inconsistent statements about whether he was with Martha at the time of her overdose, though he eventually admitted that he came to the area with her.

{¶4} Stewart was arrested after Martha's overdose incident and taken to the Logan County Jail. Then, on January 18, 2017, Trenton Mathews overdosed at the Logan County Jail. Trenton indicated he took a substance that Stewart had gotten into the jail, that it gave Trenton an opiate-like high, and that Trenton later found out the substance was "dope." Trenton was also revived with Narcan and survived. After the incident with Trenton, authorities used a confidential informant to speak with Stewart while he was in jail, and Stewart made various statements regarding giving drugs to people who had overdosed.

{¶5} As a result of the July 10, 2016, traffic stop, Stewart was indicted for Possession of Cocaine in violation of R.C. 2925.11(A)/(C)(4)(a), a fifth degree

felony and Aggravated Possession of Drugs, specifically Fentanyl, in violation of R.C. 2925.11(A), a fifth degree felony. As a result of the January 14, 2017 overdose of Martha Baker, Stewart was indicted for Corrupting Another with Drugs in violation of R.C. 2925.02(A)(3), a second degree felony. As a result of the January 18, 2017, overdose of Trenton Mathews, Stewart was indicted for Corrupting Another with Drugs in violation of R.C. 2925.02(A)(3), a second degree felony, and Illegal Conveyance of Drugs of Abuse onto Grounds of a Specified Government Facility in violation of R.C. 2921.36(A)(2), a third degree felony. All charges were presented in the same indictment, along with a charge of Engaging in a Pattern of Corrupt Activity in violation of R.C. 2923.32(A)(1)/(B)(1), a felony of the first degree, though the last charge was dismissed prior to trial. Stewart pled not guilty to the charges.

{¶6} Stewart's case proceeded to a jury trial wherein the jury found Stewart not guilty of the possession charges related to the July 10, 2016, traffic stop, and guilty of all of the remaining charges against him.

{¶7} On November 13, 2017, Stewart was sentenced to serve 7 years in prison on each of the Corrupting Another with Drugs convictions and 36 months in prison on the Illegal Conveyance conviction. All of the prison terms were ordered to be served consecutively for an aggregate 17-year prison term. It is from this

judgment that Stewart appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**Mr. Stewart was denied the effective assistance of counsel when counsel did not seek suppression of the statements by Stewart to an undercover agent while incarcerated and at a critical stage of the case in violation of his Sixth Amendment right to counsel and the parallel Ohio right.**

**Assignment of Error No. 2**
**Mr. Stewart was denied the effective assistance of counsel when counsel did not object to the Edward Yingling testimony and related non-disclosure.**

**Assignment of Error No. 3**
**The cumulative errors of trial counsel deprived Mr. Stewart of the effective assistance of counsel.**

**Assignment of Error No. 4**
**The convictions for Corrupting Another with Drugs were both against the manifest weight of the evidence.**

**Assignment of Error No. 5**
**Neither of the convictions for Corrupting Another with Drugs were supported by sufficient evidence.**

**Assignment of Error No. 6**
**The trial court erred in defining the two corrupting charges in the Jury Instructions by omitting a proper definition of a controlled substance.**

{¶8} We elect to address some of the assignments of error together, and out of the order in which they were raised.

*Fourth and Fifth Assignments of Error*

**{¶9}** In Stewart's fifth assignment of error, he argues that there was insufficient evidence presented to support his convictions for both counts of Corrupting Another with Drugs. In his fourth assignment of error, he argues that even if there was sufficient evidence presented to convict him of both counts of Corrupting Another with Drugs, his convictions were against the manifest weight of the evidence.[1]

Standard of Review

**{¶10}** Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶11}** By contrast, in reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Thompkins* at 387. In doing so, this Court must review

---

[1] Stewart makes no arguments with regard to the Illegal Conveyance conviction, thus we will not address it.

the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*. Furthermore, "[t]o reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required. *Thompkins* at paragraph 4 of the syllabus, citing Ohio Constitution, Article IV, Section 3(B)(3).

{¶12} On appeal, Stewart challenges his convictions for Corrupting Another with Drugs in violation of R.C. 2925.02(A)(3), which reads, "No person shall * * * [b]y any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person[.]"

Trial Testimony[2]

{¶13} At trial the State presented the testimony of Josh Strayer, a paramedic, who was dispatched to the overdose of Martha Baker at the Village Pantry in DeGraff on January 14, 2017. Strayer testified regarding his familiarity in dealing with overdoses, the signs of an overdose, and how opiate overdoses were combatted by the use of Narcan to neutralize the narcotic.

---

[2] The State's first handful of witnesses testified regarding the traffic stop that led to the possession charges against Stewart. As Stewart was acquitted of these charges, we will not summarize the related testimony.

{¶14} Strayer testified that when he arrived at the Village Pantry he saw Martha in the parking lot right outside her car. Martha was not breathing and Stewart was giving her CPR. Strayer testified that Martha was put onto a cot in the squad and then given an IV with Narcan. Strayer testified that after the Narcan was administered Martha became aware and told him that she had driven to the gas station, received a piece of paper with white powder on it from Stewart, and that she snorted the white powder. Strayer testified that Martha was taken to the hospital at that time and treated; however, Strayer testified that two to three months later Martha died of an overdose unrelated to Stewart.

{¶15} Deputy Drew Dixon of the Logan County Sheriff's Office was the next witness presented by the State. Deputy Dixon testified that he was dispatched to DeGraff on January 14, 2017, for an overdose. He testified that when he arrived he recognized Stewart and Stewart indicated that he found the unconscious female— Martha Baker. Deputy Dixon testified that he searched Martha's vehicle and found a clear container in a jacket pocket containing two Vicodin, a schedule II pain reliever. Deputy Dixon testified there was no label on the pill bottle.

{¶16} Deputy Adam Wood of the Logan County Sheriff's Department also responded to the scene of Martha's overdose. He testified that he spoke with Stewart at the scene and that Stewart initially stated he did not know Martha, that he just happened to be walking by her and saw her and then "jumped into action."

(Tr. at 182). Deputy Wood testified that Stewart was speaking rapidly, as though he wanted to get away. Deputy Wood testified that Stewart changed his story eventually and stated that he had arrived with Martha to the scene. Stewart indicated that he knew Martha used drugs but he did not want to get anyone into trouble. Deputy Wood testified that Stewart told him that Martha had bought Vicodin from someone. Deputy Wood testified that Stewart called 9-1-1 regarding Martha's overdose. Deputy Wood testified that Stewart was released at the scene; however, once he had information from the paramedics that Stewart had provided drugs to Martha, Stewart was arrested.

{¶17} When Stewart was taken to the Logan County jail he was searched; however, Camden Roberts, a Logan County Corrections Officer testified that cavity searches were not done unless they had a warrant to do so. Roberts testified that after Stewart was searched he was placed in a "dry cell" for some time, which was another attempt to prevent individuals from bringing drugs into the facility because the cell had a non-flushable toilet. Roberts testified that on occasion people still got drugs into the jail either orally or rectally despite the measures taken.

{¶18} Roberts testified that shortly after Stewart was removed from the dry cell and put into "B" block, Trenton Mathews fell back and lost consciousness. His breathing became shallow, and he had a "death rattle" on and off gasping for air.

Roberts testified that Mathews was revived with Narcan by another corrections officer.

{¶19} Trenton Mathews testified at trial that he was incarcerated in the Logan County Jail with Stewart and that he received a white substance on a baggie from Stewart. Mathews testified that he thought the substance was "Neurontin" but it gave him a high similar to opiates. Mathews testified that the substance was very strong, that he lost consciousness, and that he was later told it was "dope" by another inmate, which angered him because he had been "clean" from it for close to 90 days. Mathews testified that he had done drugs with inmates earlier in the day and he thought it was more of the same, but Stewart's drugs were not. Mathews testified that he licked the crumbs of drugs off of a baggie then flushed the baggie down the toilet.

{¶20} A different inmate, Blaze Kiser, testified at trial that he also used the "dope" that had been brought into the jail. He testified that it was a heroin high, not a cocaine high. Kiser testified that he initially told police that the drugs came from himself and Stewart. Kiser testified at trial that he did not convey drugs into the jail, however. At trial Kiser denied knowing that the drugs came from Stewart, stating that he could not remember what happened due to his intoxication. He testified that while he essentially overdosed that night, he did not have to be revived by Narcan.

{¶21} Detective Brent Joseph testified at trial that he was tasked with investigating Trenton's overdose at the jail. Detective Joseph testified that he spoke with Trenton and Blaze, but he wanted more evidence beyond the inmates' statements. Detective Joseph testified that he enlisted the help of Jordan Kauffman to come to the jail and pretend to be incarcerated. Kauffman would then be placed in a holding cell with Stewart and would try to get him to admit to providing the drugs to Trenton and Martha Baker.

{¶22} Jordan Kauffman did go into the cell with Stewart and Stewart made some statements regarding being incarcerated for providing heroin to someone who was outside of the jail that overdosed and that he was in trouble for someone overdosing inside the jail. A transcript of the full conversation between Kauffman and Stewart was introduced into evidence.

{¶23} The State also presented the testimony of the Logan County Coroner who testified regarding the dangers of opiate overdoses, the uses of Narcan and how it was only effective against narcotics like opiates. The coroner testified that Narcan was a "narcotic antagonist," and that it worked within seconds. (Tr. at 276). He testified that "[y]ou can bring somebody in the emergency room who's almost dead, and if you give them some Narcan, within five seconds they're wide awake talking to you. It's just really, really dramatic. It's the reason you do Narcan for a narcotic overdose." (*Id*.) The coroner testified that both heroin and Fentanyl were opiates

and they were scheduled substances, but Fentanyl was much stronger. (*Id*. at 277). On cross-examination the coroner admitted that Vicodin was an opiate-type drug, that people could overdose on it, and that it would also respond to Narcan. However, he testified that he had usually seen Narcan used for things like morphine, demerol, and heroin.

{¶24} Sara Tipton, a BCI Forensic Scientist testified that heroin was a schedule I controlled drug and Fentanyl was a schedule II controlled drug.

{¶25} Finally, the State presented the testimony of a lab criminalist from the Ohio State Highway Patrol, Edward Yingling, who analyzed Trenton Mathews' urine sample to look for the presence of drugs after Mathews's overdose. Yingling testified that the initial screening test showed the presence of Fentanyl but he was unable to confirm the results from the screening and thus the results were listed as negative for Fentanyl. The confirmation test only looked for exactly "Fentanyl" and thus would not look for compounds.

Argument and Analysis

{¶26} On appeal, Stewart argues that the State did not present sufficient evidence that he provided Martha and Trenton with a "controlled substance." He argues that at best the State established that Stewart furnished a "Fentanyl analog" to Martha and Trenton and that did not constitute a "controlled substance" as it was

defined. For the same reasons Stewart argues that his convictions for Corrupting Another with Drugs were against the manifest weight of the evidence.

{¶27} The definition in revised code 2925.01 indicates that "controlled substance" has the same meaning as it does in R.C. 3719.01. Under that section, controlled substance is defined as a "a drug, compound, mixture, preparation, or substance included in schedule I, II, III, IV, or V." Revised Code 3719.013 briefly addresses controlled substance analogs, reading "Except as otherwise provided in section 2925.03 or 2925.11 of the Revised Code, a controlled substance analog, to the extent intended for human consumption, shall be treated for purposes of any provision of the Revised Code as a controlled substance in schedule I." *See also State v. Shalash*, 148 Ohio St.3d 611, 2016-Ohio-8358.

{¶28} In this case Stewart does not seem to dispute that there was sufficient evidence to establish that he provided *some* substance to Martha Baker and Trenton Mathews or that their overdoses constituted serious physical harm. Even if he did challenge these points, there was testimony from Trenton, and from a paramedic Martha spoke to, linking Stewart to the drug transactions. There was also testimony from the coroner detailing the serious nature of the harm that results from an overdose, which included death. Thus these elements were all sufficiently established and we cannot find that the jury's determination was against the weight of the evidence.

{¶29} As to Stewart's primary contention that the State failed to establish that Stewart furnished a "controlled substance" to Martha and Trenton, the State presented testimony from various officers and medical personnel that both Martha and Trenton were revived by Narcan, and that Narcan only responded to opiates. Trenton also testified that he received a heroin-like high from the drugs and that another person told him after-the-fact that it was "dope." Blaze Kiser testified that he received a heroin-like high from the drugs. Sara Tipton, a BCI Forensic Scientist testified that heroin was a schedule I controlled drug and Fentanyl was a Schedule II controlled drug. Stewart also stated to the informant that he had provided heroin to someone outside the jail and someone inside the jail.[3] Based on the foregoing we cannot find that there was insufficient evidence presented to convict Stewart of two counts of Corrupting Another with Drugs or that his convictions were against the manifest weight of the evidence. Therefore, Stewart's fourth and fifth assignments of error are overruled.

*First Assignment of Error*

{¶30} In Stewart's first assignment of error, he argues that he received ineffective assistance of counsel when his attorney did not seek suppression of the statements Stewart made to the State's "undercover agent" related to Martha Baker. Specifically, Stewart claims that although he had not reached a "critical stage"

---

[3] Stewart does dispute the use of this admission at trial, which will be discussed *infra*.

related to the Trenton Mathews investigation at the time the State's agent was sent to question him, he had reached a critical stage as to the Martha Baker investigation, thus it was impermissible to use an agent to elicit statements regarding Martha Baker and then use those statements in court. Stewart argues that his counsel was ineffective for failing to seek suppression of the statements regarding Martha at trial, or at the very least his counsel was ineffective for failing to have the statements related to Martha redacted.

Standard of Review

{¶31} "To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him." *State v. Hernandez*, 3d Dist. Defiance Nos. 4–16–27, 28, 2017–Ohio–2797, ¶ 12, citing *State v. Phillips*, 3d Dist. Allen No. 1–15–43, 2016–Ohio–3105, ¶ 11, citing *State v. Jackson,* 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 133, citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

**{¶32}** We note that a tactical decision by trial counsel, who as a licensed attorney is presumed to be competent, is not by itself enough to show ineffective assistance of counsel simply because the strategy did not result in an acquittal. *State v. Clatyon*, 62 Ohio St.2d 45, 48-49 (1980); *State v. Timm*, 3d Dist. Seneca No. 13-11-23, 2012-Ohio-410, ¶ 31. "Furthermore, trial counsel's failure to object is generally viewed as trial strategy and does not establish ineffective assistance." *State v. Turks,* 3d. Dist. Allen No. 1–08–44, 2009–Ohio–1837, ¶ 43, citing *State v. McKinney,* 11th Dist. Trumbull No.2007–T–0004, 2008–Ohio–3256, ¶ 191; *State v. Conway,* 109 Ohio St.3d 412, 2006–Ohio–2815, ¶ 103.

Alleged Ineffective Assistance

**{¶33}** In this case Stewart was originally arrested for Corrupting Another with Drugs related to Martha Baker, who overdosed on January 14, 2017. When he was first incarcerated, he was placed into a "dry cell" in an attempt to flush out any drugs he may have been concealing. Corrections officers testified that despite these precautions, inmates were still occasionally able to bring drugs into the facility.

**{¶34}** After Stewart was released from the "dry cell" into the general population, Trenton Mathews indicated he received drugs from Stewart and he subsequently overdosed. Stewart was then removed from the general population again.

{¶35} Detective Brent Joseph was assigned to investigate Mathews's overdose. As part of his investigation he enlisted the help of a male, Jordan Kauffman, who had recently got out of the marines. Kauffman would pose as another inmate in an attempt to get Stewart to admit that he had given Martha and Mathews heroin. Detective Joseph testified that he specifically instructed Kauffman to ask about both Trenton *and* Martha. An audio excerpt of Kauffman's conversation with Stewart was introduced into evidence and a full transcript was also provided to the jury. The transcript reads, in pertinent part, as follows.

[Informant placed into holding cell with Stewart]

(No speaking for approximately 45 minutes.)

**INFORMANT: What's going on?**

**DEFENDANT: How long you got? Maybe detox or anything?**

**INFORMANT: No, I'll be all right for a little bit. I've got 90 days.**

**DEFENDANT: Oh, you got 90 days?**

**INFORMANT: Yeah.**

**DEFENDANT: You just come in today?**

**INFORMANT: Yeah.**

**DEFENDANT: How did you end up getting 90 days and coming in today?**

**INFORMANT: Pulled me over for expired tags. I have a felony in California, so I'm getting extradited over there. So, I've got 90**

**days here, and I go for ever how long there. Caught me with pills in my car, all that good shit.**

**DEFENDANT:  You had pills in your car?**

**INFORMANT:  Yeah.  They're mine.  I've got out of the military awhile ago from Afghan, got blown up.  So I've been trying to deal with pain, but they won't fucking listen over here.**

**DEFENDANT:  What kind of pills were they?**

**INFORMANT:  Perc thirties.**

**DEFENDANT: Yeah?**

**INFORMANT:  I had some Valiums too, shit like that.  Fucking sucks.  What about you?**

**DEFENDANT:  Well, I'm kinda fucked.  I had originally – I got an F2.**

**INFORMANT:  Yeah.**

**DEFENDANT: Cause when I sold the heroin, someone overdosed. Come in here with a bunch of heroin and then give some – when they let me go back to the block, I give some to somebody and they overdose.**

**INFORMANT:  No shit.**

**DEFENDANT:  So I got two F2's now.**

**INFORMANT:  Damn.  In here?**

**DEFENDANT:  Huh?**

**INFORMANT:  Can you get some shit in here?**

**DEFENDANT:  I had shit.**

**INFORMANT:  Oh, you had shit in here?**

**DEFENDANT:  Yeah. That's what they – that's what I'm charged with, for allegedly having shit.**

**INFORMANT:  Right.  Fuck, man, that's some shit.  So how long you thinking?**

**DEFENDANT:  I don't know.  I mean, I might at least be in here for another three weeks.**

**INFORMANT:  Another three weeks in here?  Are you going anywhere else after that?**

**DEFENDANT:  No.**

**INFORMANT:  No?**

**DEFENDANT:  Until I get sentenced or whatever.**

**INFORMANT:  Oh, yeah?  You got to wait a while for that, don't you?**

**DEFENDANT:  Yeah. (Indiscernible).  Shit.**

**INFORMANT:  You ain't getting any charges, though, for like manslaughter or anything, right?  Nobody, like --**

**DEFENDANT:  No.  They survived.**

**INFORMANT:  --nobody overdosed?  They survived?**

**DEFENDANT:  The F2 is called corruption of a person, or something.**

**INFORMANT:  Really?**

**DEFENDANT:  Giving them the drugs that is a Schedule I or II narcotic and it causes serious harm or some shit.**

**INFORMANT:** Oh, I didn't know that. So, you got F2's for people in here?

**DEFENDANT:** From in here. One on the street and one from in here.

**INFORMANT:** Wow. Fuck, man. How do they know it was you for in here?

**DEFENDANT:** I think people wrote statements. I'm fucked.

**INFORMANT:** Okay. Yeah, fucking sucks. Where are you from? You from around here?

**DEFENDANT:** Quincy.

**INFORMANT:** Quincy? (Indiscernible). I ain't been up there. I haven't been home (indiscernible).

**{¶36} DEFENDANT:** Where are you from?

**INFORMANT:** I'm from around here, but I moved to California for the Marine Corp and then I stayed out there, got in some trouble, and that's how (indiscernible), got all the way here, got pulled over for expired tags. So --

**DEFENDANT:** Did you have a prescription for your medicine?

**INFORMANT:** No.

**DEFENDANT:** No.

**INFORMANT:** The VA stopped giving it to me for several years.

**DEFENDANT:** How many was the – how much are thirties down there?

**INFORMANT:** I was getting them free from the VA, from the veteran's affairs. For on the way back, they wouldn't give it to

me because I hopped town, so when I got up here, met up with a buddy, I bought probably a bottle for, like, 120. So –

DEFENDANT: A bottle of them? That's cheap.

INFORMANT: Yeah, it wasn't bad. I knew the guy for a long time. We served together. So, when I met up with him, he was coming down off of them he said he didn't need them, so, I said I'll give you 120 bucks for them. (Indiscernible). Then soon – like as soon as I got them, I get pulled over. It was, like, boom. What's the daily routine like around here?

DEFENDANT: We're going to be stuck in the cell until the nurse clears us. Whenever she comes in, then you go back to a block, watch TV or do (indiscernible).

INFORMANT: What's Quincy like?

DEFENDANT: Little – real little town.

INFORMANT: Like small punkin'.

RADIO: (Indiscernible).

DEFENDANT: What is it? Just --

INFORMANT: Just small farm town or whatever?

DEFENDANT: Yeah.

INFORMANT: Like around here?

DEFENDANT: Yeah.

INFORMANT: Did you know the person that overdosed on the outside?

DEFENDANT: Uh-huh.

INFORMANT: That's tough, man.

**DEFENDANT:** Can't do – it's an F2 felony. Crazy.

**INFORMANT:** Yeah.

**DEFENDANT:** I mean, I – I understand that I – I had been the one that sold it, but, you know, I could sell you something. I'm not – I don't tell you, you know, --you're –here's $500 and shit, like – like, if you buy the shit, you buy the whole bottle, like, here's a whole bottle, man, you spend $120, just go ahead and do them all and overdose.

**INFORMANT:** Right.

**DEFENDANT:** It should be on the person if they want one or two or 15 or 20 of them. That's crazy.

**INFORMANT:** Yeah. That's fucking crazy. Well, I – didn't know because I thought with my medical record I already had the pills on my chart. Like, I'm supposed to be taking them anyway but the VA cut me off, so I figured if I can get them, I'll be all right, you know. I didn't think – just like (indiscernible) of that, I was, like, I just need the medicine, you know, deal with some pain. But, fucking – just like that. Next thing I know, I'm fucking in here. Like, I didn't know what was going on. You know anybody that can get me some shit for pain.

**DEFENDANT:** Huh?

**INFORMANT:** You got anything for pain?

**DEFENDANT:** How many thirties did you do a day?

**INFORMANT:** Huh?

**DEFENDANT:** How many did you do a day?

**INFORMANT:** I was taking them like Skittles, man. Like, I was a working fucking addict. Like, I could take them and be just fine. I go take a shit ton, even put me to asleep [sic]. So, I was

**talking, like eight to ten within the first morning, and then whatever on the come down. It all depends because my shoulders, my head, my knees, it's all fucked up. I got blown up over there. I got fucking Jew'd by my own government. It's fucking bullshit.**

[The conversation between the defendant and the informant effectively ends here.]

(Joint Ex. II, p. 11-18).

{¶37} On appeal, Stewart argues that it was error to permit the introduction of incriminating statements that he made to a government informant regarding Martha Baker when he was already charged with a crime related to Martha. Stewart contends that this is particularly true given that the statements that he made regarding Martha were deliberately elicited by an agent of the government in the absence of Stewart's attorney.

{¶38} Stewart does concede that since he had not yet been charged related to Mathews at the time of his conversation with the informant, the informant's "questioning" regarding Mathews would be permissible and thus admissible at trial. However, he claims that any questions related to Martha Baker amounted to secret interrogation of the type that is prohibited by multiple cases from the Supreme Court of the United States. *See Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 2398-99 ("the government may not use an undercover agent to circumvent the Sixth Amendment right to counsel once a suspect has been charged with the crime. After charges have been filed, the Sixth Amendment prevents the government from

interfering with the accused's right to counsel."); *Massiah v. U.S.*, 377 U.S. 201 (1964); *United States v. Henry*, 447 U.S. 264 (1980) ("By intentionally creating a situation likely to induce respondent to make incriminating statements without the assistance of counsel, the Government violated respondent's Sixth Amendment right to counsel. Under the facts—particularly the facts that the informant was acting under instructions as a paid informant for the Government while ostensibly no more than a fellow inmate, and that respondent was in custody and under indictment at the time—incriminating statements were 'deliberately elicited' from respondent within the meaning of *Massiah*."); *Kuhlman v. Wilson*, 477 U.S. 436 (1986) ("[T]he defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.").

{¶39} Stewart argues that since any government-directed deliberate interrogation of him related to Martha would have been inadmissible pursuant to the preceding Supreme Court decisions, his counsel was ineffective for failing to file a suppression motion seeking to suppress it, for failing to move for separate trials, or at the very least to have any statements related to the Martha Baker case redacted.

{¶40} By contrast, the State argues that Stewart's right to counsel had not yet attached with regard to the Trenton Mathews investigation, that Stewart essentially volunteered the information to the informant, meaning there was no real action

beyond listening to elicit the remarks, and that if there was any error in this case it was harmless.

{¶41} While the State and Stewart are in agreement that Stewart's right to counsel had not yet attached with regard to the Trenton Mathews investigation, we cannot agree with the State that his right to counsel had not attached with regard to the Martha Baker investigation since Stewart was charged related to that crime beforehand and was incarcerated for it awaiting trial. At oral argument, the State contended that the right to counsel did not attach until an arraignment on an indictment. However, the Supreme Court of the United States held in *Rothgery v. Gillespie County, Tex*., 554 U.S. 191, 128 S.Ct. 2578 (2008), that "for purposes of the right to counsel, commencement [is tied to] ' "the initiation of adversary judicial criminal proceedings—*whether by way of formal charge, preliminary hearing, indictment, information, or arraignment*." ' " (Emphasis added) *Rothgery* at 198, quoting *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, (1984), quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877 (1972) (plurality opinion). Although there is nothing in the record indicating whether Stewart had been arraigned on the Martha Baker charge at the time of his conversation with the informant, it seems to be undisputed that Stewart was already charged related to Martha Baker at the time of the conversation. Thus based on the authority of the Supreme Court of the United States we cannot agree with the State's blanket

assertion that since Stewart's right to counsel had not yet attached with regard to Trenton Mathews the State was free to deliberately send an informant in to interrogate him regarding Martha Baker.

**{¶42}** Nevertheless, although Detective Joseph did send the informant into Stewart's holding cell specifically with the goal in mind of getting Stewart to admit to his culpability related to Mathews *and* Martha Baker, the preceding transcript of the conversation illustrates that the informant took little action beyond merely listening.[4] The informant initiated conversation but he did not specifically inquire directly into Stewart's crimes regarding Martha Baker. The conversation began with the informant indicating what he was allegedly incarcerated for, then the informant asked Stewart broadly, "What about you?" It was a generic question, yet Stewart readily volunteered claims regarding why he was incarcerated, which was for selling heroin, someone overdosing, then giving some to people in the block and that person overdosed.

**{¶43}** The only time the informant seemed to directly inquire about Martha Baker was when he asked Stewart, "Did you know the person that overdosed on the outside?" By that point in the conversation, Stewart had already essentially brought

---

[4] We must express that the officer *should not* have directed the informant to inquire regarding Martha Baker. The State was fortunate that Stewart so readily provided information on why he was incarcerated before the informant ever asked a specific question regarding Baker.

it up on his own, though he never used the name Martha Baker. In fact, he never uses her name at all and neither does the informant.

**{¶44}** The conversation illustrates that Stewart readily spoke to the informant, volunteering information on a number of issues that the informant had not yet specifically asked about before he inquired about the person that overdosed on the outside. *See United States v. Stubbs*, 944 F.2d 828, 832 (11th Cir.1991) ("*Miranda* and Fifth Amendment concerns are not implicated when a defendant misplaces her trust in a cellmate who then relays the information—whether voluntarily or by prearrangement—to law enforcement officials."). There is no indication that Stewart felt he was under any compulsion. *See Perkins* at 300 ("Where the suspect does not know that he is speaking to a government agent there is no reason to assume the possibility that the suspect might feel coerced."). The single question alone about the person on the outside, when looked at in context of the conversation, does not appear to give rise to the violation Stewart asserts.

**{¶45}** However, even if we accepted that the informant being directed into the cell with the intent of asking about the Martha Baker overdose and his questions of "What about you?" and "Did you know the person that overdosed on the outside?" constituted *action* designed deliberately to elicit incriminating remarks, we cannot find that the remarks related to Martha Baker constituted anything but harmless error. Stewart's only statements regarding Martha Baker in the

interrogation were that he was confined for allegedly selling heroin to someone on the outside, that someone overdosed, that it was on the street, and that he knew the person. All of these statements were presented elsewhere in the record.

{¶46} At this point in the trial, the jury already had heard the testimony from the paramedic that revived Martha that Martha identified Stewart as the person providing her the drugs. Stewart was the first person on the scene of Martha's overdose, he was with Martha at the time, and he told the officers—eventually— that he knew her and arrived with her. He was also attempting CPR on her. Stewart further was aware that Martha had two Vicodin with her, indicating even more knowledge of her circumstances. Thus even assuming that the statements Stewart made related to Martha should have been excluded from the trial, we cannot find that it would be anything more than harmless error. This is especially true given that Stewart does not ever specifically name Martha Baker to the informant, though it could certainly be inferred from the conversation that she was who he was referring to.

{¶47} Moreover, we note that Stewart's trial counsel argued that the conversation with the informant actually showed that Stewart was really only stating what he was being charged with, not his culpability. The informant also testified himself that he felt Stewart was just stating what he was alleged to have done and why he had ended up there.

{¶48} To find ineffective assistance of counsel, which is Stewart's ultimate allegation, we would have to find that counsel erred and that the error was prejudicial, impacting the ultimate outcome of the case. Taking everything into account, even assuming *arguendo* that any interrogation beyond that directly related to Trenton Mathews was improper here, we cannot find that the circumstances of this case rose to anything beyond harmless error, thus there is no prejudice and we cannot find that his trial counsel was ineffective on this matter. Therefore, Stewart's first assignment of error is overruled.

*Second Assignment of Error*

{¶49} In Stewart's second assignment of error, he argues that his counsel was ineffective for failing to object to Edward Yingling's testimony and for failing to object to the State's failure to disclose evidence related to Yingling's testimony.[5]

{¶50} At trial, Edward Yingling testified on behalf of the State that he tested Trenton Mathews's urine after Mathews had overdosed. He testified that the initial screen showed Fentanyl was potentially present but when he ran the confirmation test he was unable to confirm his findings. Thus he could not state that there was Fentanyl in Mathews's urine, though the presumptive screening was positive.

{¶51} On appeal, Stewart argues that nothing in the State's written report summarizing Yingling's testimony indicated that there was ever an initial screening

---

[5] We refer to the "ineffective assistance" standard of review from the prior assignment of error rather than repeating it here.

that showed the presence of Fentanyl in Mathews's urine; rather, he contends that Yingling's written report merely stated that there was a negative screening. Stewart contends that his trial counsel was unaware of this information, and that he was ineffective for failing to seek to have the statements declared inadmissible at trial.

{¶52} At the outset, there is simply nothing in the record to substantiate Stewart's claim on appeal that his trial counsel was unaware of Yingling's testimony regarding the initial screening. In fact, Stewart's attorney *affirmatively indicated* that Yingling's testimony was anticipated after Yingling testified. (Tr. at 349). There is no indication whatsoever that he was somehow "surprised" by this revelation.

{¶53} This is further established by the fact that there was no objection to Yingling's testimony. Moreover, Stewart's attorney was able to thoroughly cross-examine Yingling related to his testimony. We fail to see any evidence in the record that there was any lack of disclosure on behalf of the State that somehow prejudiced Stewart. We also fail to see how counsel was ineffective on that basis. Therefore, Stewart's second assignment of error is overruled.

*Sixth Assignment of Error*

{¶54} In Stewart's sixth assignment of error, he argues that the trial court erred in defining "controlled substance" for the jury related to the Corrupting Another with Drugs charges. Stewart argues that the trial court did not read R.C.

3719.01(C) in its entirety or in relevant part. Stewart further contends that while some analogs of some controlled substances are included in the Ohio controlled substance schedules, Fentanyl analogs were not, and if the jury had been informed of this, Mathews would not have been found guilty.

{¶55} In this case the jury was instructed that the "controlled substance" involved for the "Corrupting" charges had to be a "compound, mixture, preparation, or substance included in Schedule I or Schedule II." (Tr. at 378). This is essentially the exact definition of controlled substance in R.C. 3719.01(C). Moreover, the definition of "controlled substance" itself allows for a mixture of the substance. Thus we fail to see how the jury instructions were improper here.

{¶56} Furthermore, we could not find plain error here given that there was testimony that heroin and Fentanyl were Schedule I and Schedule II drugs respectively and that Stewart stated to the informant that he had given the victims heroin. The jury could also make an inference that the heroin-like high Mathews and Kiser received were, in fact, from heroin, particularly when coupled with the fact that Mathews was revived by Narcan, which as noted earlier, was described by medical experts as only being effective on opiates. Under these circumstances we cannot find that plain error existed. Therefore, Stewart's sixth assignment of error is overruled.

*Third Assignment of Error*

**{¶57}** In Stewart's third assignment of error, he makes multiple additional arguments contending that he was deprived of the effective assistance of counsel. He also argues that the cumulative errors of counsel amounted to ineffective assistance.[6]

**{¶58}** First, Stewart argues that his trial counsel was unfamiliar with the State's witness list; however, he bases this contention on counsel being briefly confused because two of the State's witnesses had the same last name. Regardless of the brief confusion, trial counsel indicated that he thought he knew what the witness was going to say before he testified. Thus we cannot find trial counsel was unprepared or somehow ineffective on this basis. There is certainly no showing of prejudicial error.[7]

**{¶59}** Second, Stewart argues that his counsel was ineffective for failing to object to testimony indicating that he was on parole and his refusal to provide a urine sample. However, as noted by the State, this evidence was relevant to the possession charges from the traffic stop that Stewart was acquitted of. His refusal to provide the urine sample, as he was required to do under his parole, was intended

---

[6] We again refer back to the standard of review cited in the first assignment of error.

[7] Stewart makes a summary argument that trial counsel was "unaware" of the defense's case because he had not spoken to a specific witness that Stewart wanted him to call. Defense counsel indicated that he had only been notified of the existence of potential witnesses two days before trial. Regardless, he was able to speak to the witness before testifying, and the witness did not possess any relevant admissible information to the case.

to show that he was the one who possessed the drugs that were in the car. Regardless, Stewart was acquitted of these counts against him. Therefore, we can find no related ineffective assistance here as the results clearly did not prejudice Stewart.

**{¶60}** Third, Stewart argues that counsel failed to ensure that the jury was adequately instructed with regard to controlled substances. We have already found this is not the case, thus this argument is not well-taken.

**{¶61}** Finally, Stewart contends that his counsel erred by failing to seek separate trials in this case. However, given that the jury acquitted Stewart of two crimes against him, the jury seemed perfectly capable of discerning between the counts. *State v. Wilson,* 2d Dist. Montgomery No. 20910, 2005–Ohio–6666, ¶ 38, quoting *State v. Fletcher,* 2d Dist. Clark No.2003–CA–62, 2004–Ohio–4517, ¶ 41 ("a defendant is not prejudiced by joinder where the joined offenses are 'simple and direct, so that a jury is capable of segregating the proof required for each offense.' ") Thus this argument is not well-taken. As we have not found multiple instances of ineffective assistance of counsel, we cannot find any cumulative error here, therefore Stewart's third assignment of error is overruled.

*Conclusion*

**{¶62}** For the foregoing reasons Stewart's assignments of error are overruled and the judgment of the Logan County Common Pleas Court is affirmed.

***Judgment Affirmed***

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**